**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ───────────────────────────── x | |
| SCOTT MILLER, individually on : | |
| behalf of himself and all others similarly : | |
| situated, : | Case No. |
| : | |
| Plaintiff, : | |
| v. : | |
| : | |
| : | **CLASS ACTION COMPLAINT** |
| JEAN PIERRE, INC., : | |
| : | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. : | |
| : | |
| : | |
| ───────────────────────────── x | |

Plaintiff, Scott Miller (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.      This action seeks to remedy the deceptive and misleading business practices of Jean Pierre, Inc. (hereinafter "Defendant") with respect to the marketing and sales of Defendant's Blum Naturals and Baby Blum Naturals product lines throughout the State of New York and throughout the country.  The Blum Naturals and Baby Blum Naturals product lines include the following products (hereinafter the "Products"):

- Blum Naturals Hand Cream with Jojoba Oil;

- Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Combination/Oily;

- Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Dry/Sensitive Skin;

1

- Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Exfoliating;

- Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Pro Age;

- Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Normal Skin;

- Blum Naturals Daily Eye Cleansing Pads;

- Blum Naturals Daily Eye Make Up Remover;

- Blum Naturals Daily Facial Cleanser, Lavender;

- Blum Naturals Exfoliating Cleanser with Apricot Seeds;

- Baby Blum Naturals Soothing Lotion Baby Wipes;

- Baby Blum Naturals Sensitive Baby Wipes;

- Blum Naturals Moisturizing Day Cream;

- Blum Naturals Nourishing Night Cream;

- Blum Naturals Eye & Neck Cream;

- Blum Naturals Lifting Eye Serum;

- Blum Naturals Face Serum;

- Blum Naturals All Purpose Cleansing Wipes – Fragrance Free;

- Blum Naturals All Purpose Cleansing Wipes – Citrus Scent;

- Blum Naturals All Purpose Cleansing Wipes – Fresh Scent;

- Blum Naturals Exfoliating Peeling Mask with Red Algae;

- Blum Naturals Feminine Cleansing & Intimate Wipes – Fragrance Free;

- Blum Naturals Feminine Cleansing & Intimate Wipes – Light Fresh Scent.

2

2.     Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers, i.e. that its Products are "Natural."  However, Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products contain synthetic ingredients.

3.     Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products are "Natural" when purchasing the Products.  Plaintiff and Class Members paid a premium for the Products based upon their "Natural" representation.  Given that Plaintiff and Class Members paid a premium for the Products based on Defendant's misrepresentations that they are "Natural," Plaintiff and Class Members suffered an injury in the amount of the premium paid.

4.     Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350, the consumer protection statutes of all 50 states, and the Magnuson-Moss Warranty Act.  Defendant breached and continues to breach its express warranty regarding the Products.  Defendant has been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendant on behalf of himself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

**FACTUAL BACKGROUND**

5.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products and everyday household products.  Companies such as Defendant have capitalized on consumers' desire for purportedly "natural" products.  Indeed, consumers are willing to pay, and have paid, a premium for products

branded "natural" over products that contain synthetic ingredients.  In 2015, sales of natural

products grew 9.5% to $180 billion.[1]  Consumers, including Plaintiff and

Class Members, value natural products for important reasons, including the belief that they are

safer and healthier than alternative products that are not represented as natural.

6.      Despite the Products containing a number of synthetic ingredients, Defendant

markets the Products as being "Natural." The Products' labeling is depicted below:

---

[1] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ,* FOOD NAVIGATOR,
http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-
claims/(page)/6; *see also* Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural"
Products*, INVESTOPEDIA (February 22, 2017),
http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-
products.asp (Study by Kline Research indicated that in 2016, the personal care market reached
9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care
industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for
growth? [NEXT Forecast 2017]*, NEW HOPE NTWORK (December 20, 2016),
http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-
2017.

**Blum Naturals Hand Cream with Jojoba Oil**



**Synthetic Ingredients:**

Cetyl Alcohol
Cetearyl Alcohol
Glyceryl Stearate SE
Caprylic/Capric Triglyceride
Glycerin
Propanediol
Tocopheryl Acetate (Vitamin E)
Sodium Benzoate
Potassium Sorbate
Benzyl Alcohol
Benzoic Acid
Benzyl Benzoate
Citral
Citronellol
Farnesol
Geraniol
Limonene
Linalool

5

**Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Combination/Oily**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

6

**Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Dry/Sensitive Skin**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

7

**Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Exfoliating**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

8

**Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Pro Age**



**Synthetic Ingredients:**

Decyl Glucoside
Tocopheryl Acetate (Vitamin E)
Citric Acid
Sodium Benzoate
Glycerin

9

**Blum Naturals Daily Cleansing & Make Up Remover Towelettes Daily Normal Skin**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

10

**Blum Naturals Daily Eye Cleansing Pads**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

**Blum Naturals Daily Eye Make Up Remover**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

**Blum Naturals Daily Facial Cleanser, Lavender**



**Synthetic Ingredients:**

Glycerin
Coco-Glucoside
Glyceryl Oleate
Xanthan Gum
Citric Acid
Benzyl Alcohol
Linalool

**Blum Naturals Exfoliating Cleanser with Apricot Seeds**



**Synthetic Ingredients:**

Glycerin
Coco-Glucoside
Glyceryl Oleate
Xanthan Gum
Citric Acid
Benzyl Alcohol

**Baby Blum Naturals Soothing Lotion Baby Wipes**



**Synthetic Ingredients:**

Decyl Glucoside
Capric/Caprylic Triglyceride
Glycerin
Tocopheryl Acetate
Xanthan Gum
Sodium Benzoate

**Baby Blum Naturals Sensitive Baby Wipes**



**Synthetic Ingredients:**

Decyl Glucoside
Glycerin
Tocopheryl Acetate
Sodium Benzoate

**Blum Naturals Moisturizing Day Cream**



**Synthetic Ingredients:**

Glyceryl Stearate SE
Cetyl Alcohol
Caprylic/Capric Triglyceride
Xylitol
Propanediol
Glycerin
Tocopheryl Acetate (Vitamin E)
Benzyl Alcohol
Benzoic Acid

**Blum Naturals Nourishing Night Cream**



**Synthetic Ingredients:**

Glyceryl Stearate SE
Cetyl Alcohol
Caprylic/Capric Triglyceride
Cetearyl Alcohol
Propanediol
Glycerin
Tocopheryl Acetate (Vitamin E)
Benzyl Alcohol
Benzoic Acid

**Blum Naturals Eye & Neck Cream**



**Synthetic Ingredients:**

Glyceryl Stearate SE
Cetyl Alcohol
Caprylic/Capric Triglyceride
Cetearyl Alcohol
Propanediol
Glycerin
Tocopheryl Acetate (Vitamin E)
Benzyl Alcohol
Benzoic Acid

**Blum Naturals Lifting Eye Serum**



**Synthetic Ingredients:**

Propanediol
Glycerin
Xantham Gum
Tocopheryl Acetate (Vitamin E)
Cetearyl Alcohol
Glyceryl Stearate SE
Benzyl Alcohol
Citric Acid
Benzoic Acid
Benzyl Benzoate
Citral
Citronellol
Farnesol
Geraniol
Limonene
Linalool

**Blum Naturals Face Serum**



**Synthetic Ingredients:**

Propanediol
Glycerin
Xantham Gum
Tocopheryl Acetate (Vitamin E)
Cetearyl Alcohol
Glyceryl Stearate SE
Benzyl Alcohol
Citric Acid
Benzoic Acid
Benzyl Benzoate
Citral
Citronellol
Farnesol
Geraniol
Limonene
Linalool

**Blum Naturals All Purpose Cleansing Wipes – Fragrance Free**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

**Blum Naturals All Purpose Cleansing Wipes – Citrus Scent**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

23

**Blum Naturals All Purpose Cleansing Wipes – Fresh Scent**



**Synthetic Ingredients:**

Decyl Glucoside
Sodium Benzoate
Glycerin

**Blum Naturals Exfoliating Peeling Mask with Red Algae**



**Synthetic Ingredients:**

Cetearyl Alcohol
Glyceryl Stearate SE
Sorbitan Olivate
Tocopheryl Acetate (Vitamin E)
Benzyl Alcohol
Benzoic Acid
Citronellol
Limonene
Linalool

**Blum Naturals Feminine Cleansing & Intimate Wipes – Fragrance Free**



**Synthetic Ingredients:**

Decyl Glucoside
Lactic Acid
Sodium Benzoate
Glycerin

**Blum Naturals Feminine Cleansing & Intimate Wipes – Light Fresh Scent**



**Synthetic Ingredients:**

Decyl Glucoside
Lactic Acid
Sodium Benzoate
Glycerin

7.      Defendant's representations that the Products are "Natural," is false, misleading, and deceptive because the Products contain multiple ingredients that are, as explained below, synthetic.

a.    **Citric Acid** is (2-hydroxy-propane-1, 2,3-tricarboxylic acid) is a synthetic substance.  While the chemical's name has the word "citric" in it, citric acid is no longer extracted from the citrus fruit but industrially manufactured by fermenting certain genetically mutant strains of the black mold fungus, *Aspergillus niger*.

b.    **Decyl Glucoside** is a synthetic ingredient obtained by the condensation of decyl alcohol and glucose. [2]

c.    **Sodium benzoate** is a synthetic preservative.[3]  Sodium benzoate is produced by the neutralization of benzoic acid with sodium hydroxide, or by adding benzoic acid to a hot concentrated solution of sodium carbonate until effervescence ceases. The solution is then evaporated, cooled and allowed to crystalize or evaporate to dryness, and then granulated.  It does not occur naturally.[4]  Sodium benzoate has been shown to cause DNA damage and chromosomal aberrations.[5]  When sodium benzoate combines with ascorbic acid (an ingredient common in many food products) the two substances can react to produce benzene, which is a highly toxic carcinogen.

---

[2] http://www.newdirections.com.au/articles/images/Decyl-Glucoside-and-Other-Alkyl-Glucosides-as-Used-in-Cosmetics.pdf.

[3] http://www.ewg.org/skindeep/ingredient/705989/SODIUM_BENZOATE/; http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm274535.htm.

[4] 21 C.F.R. § 184.1733.

[5] N. Zengin et al., *The Evaluation of the Genotoxicity of Two Food Preservatives: Sodium Benzoate and Potassium Benzoate*, FOOD AND CHEMICAL TOXICOLOGY 763, 764-68 (2011).

d.   **Tocopheryl Acetate** is a synthetic, inert ingredient used pre and post-harvest as an ingredient in pesticide formulations applied to growing crops or to raw agricultural commodities after harvest.  *See* 40 C.F.R. § 180.910.

e.   **Caprylic/Capric Triglyceride** is the chemical name for octanoic acid. It is commercially prepared by oxidation of *n* -octanol or by fermentation and fractional distillation of the volatile fatty acids present in coconut oil.  *See* 21 C.F.R. § 184.1025.

f.   **Stearic Acid (Glyceryl Stearate)** is a mixture of variable proportions of glyceryl monostearate, glyceryl monopalmitate, and glyceryl esters of fatty acids present in commercial stearic acid.  It is recognized by federal regulations as synthetic.  *See* 7 C.F.R. § 205.605(b).

g.   **Cetyl Alcohol/Cetearyl Alcohol** is a synthetic flavoring substance and adjuvant. *See* 21 C.F.R. § 172.515.

h.   **Coco Glucoside** is a synthetic ingredient obtained by the condensation of glucose and coconut alcohol.[6]

i.   **Benzyl Alcohol** is a synthetic ingredient used as a solvent and preservative; has been associated with contact allergies.[7]

j.   **Glyceryl Oleate** is a mixture of monoglycerides.  It is used primarily as an emulsifier in cosmetic products. [8]

---

[6] http://www.newdirections.com.au/articles/images/Decyl-Glucoside-and-Other-Alkyl-Glucosides-as-Used-in-Cosmetics.pdf.
[7] http://www.ewg.org/skindeep/ingredient/700697/BENZYL_ALCOHOL/.
[8] http://www.beauty-review.nl/wp-content/uploads/2014/07/Final-Report-on-the-Safety-Assessment-of-Glyceryl-Oleate.pdf.

k.   **Benzoic Acid** is synthetic. It is manufactured by treating molten phthalic anhydride with steam in the presence of a zinc oxide catalyst, by the hydrolysis of benzotrichloride, or by the oxidation of toluene with nitric acid or sodium bichromate or with air in the presence of a transition metal salt catalyst. *See* 21 C.F.R. § 184.1021.

l.   **Linalool** is a synthetic substance and adjuvant. *See* 21 C.F.R. § 182.60.

m.   **Limonene** is a synthetic substance and adjuvant. *See* 21 C.F.R. § 182.60.

n.   **Geraniol** is a synthetic substance and adjuvant. *See* 21 C.F.R. § 182.60.

o.   **Benzyl Benzoate** is a synthetic substance and adjuvant. *See* 21 C.F.R. § 172.515.

p.   **Citral** is a synthetic substance and adjuvant. *See* 21 C.F.R. § 182.60.

q.   **Citronellol** is a synthetic substance and adjuvant. *See* 21 C.F.R. § 172.515.

r.   **Xanthan Gum** is a polysaccharide derived from the fermentation of sugars by anthomonas campeseri bacterium and purification using isopropyl alcohol.  It is listed as a synthetic ingredient by federal regulation and is typically used as a thickening or stabilizing agent in beverages and as emulsifiers in salad dressings. *See* 7 C.F.R. § 205.605(b).  A 2012 article in the Journal of Pediatrics noted that the U.S. Food & Drug Administration issued warnings that products containing xanthan gum have been linked to illness and death in infants.[9]

s.   **Xylitol** is a synthetic ingredient. It is in fact is a sweetening agent derived from the crushed fibers of sugar cane in birch wood and/or corn through a harsh multi-step chemical reaction that involves the use of sulfuric acid, calcium oxide, phosphoric

---

[9] Jennifer Beal, MPH et al., *Late Onset Necrotizing Enterocolitis in Infants Following Use of a Xanthan Gum-Containing Thickening Agent*, 161 THE JOURNAL OF PEDIATRICS 2, 354 (2012).

acid and active charcoal. Typical production of xylitol begins from a plant product xylan, which is hydrolyzed into xylose and catalytically hydrogenated into xylitol, thought a comprehensive chemical process. Moreover, commercial production of xylitol often requires the use of genetically modified corn, which cannot be described as natural.

t.  **Propanediol also known as Propylene Glycol** (1,2-propanediol) is manufactured by treating propylene with chlorinated water to form the chlorohydrin which is converted to the glycol by treatment with sodium carbonate solution. It is also prepared by heating glycerol with sodium hydroxide. *See* 21 C.F.R. § 184.1666.

u.  **Sorbitan Olivate** is synthetic, formed by the esterification of sorbitan with the wax obtained by partial hydrogenation of olive oil.

v.  **Potassium Sorbate** is a synthetic preservative.[10]  *See* 21 C.F.R. § 582.3640.  It is created by using potassium hydroxide (KOH) to neutralize sorbic acid (C6H8O2). The resulting potassium sorbate may be crystallized from aqueous ethanol.  Studies have shown Potassium Sorbate to have genotoxic effects on humans and other mammals.[11]  It causes chromosomal aberrations in cells, which can trigger the development of cancer.[12]

w.  **Farnesol** is a synthetic substance and adjuvant. *See* 21 C.F.R. § 172.515.

x.  **Lactic Acid** is a federally-listed synthetic substance that is added to foods as a synthetic flavorant, acidity regulator, and preservative.  *See* 21 C.F.R. § 172.515(b);

---

[10] http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm274535.htm.
[11] Sevcan Mamur et al., *Does Potassium Sorbate Induce Genotoxic or Mutagenic Effects in Lymphocytes?*, TOXICOLOGY IN VITRO 790, 793 (2010).
[12] *Id*.

*see also Food Ingredients and Colors,* E270, *Current EU Approved Additives and their E Numbers,* http://www.food.gov.uk/policy advice/additivesbranch/enumberlist#anchor_3. Although lactic acid exists naturally in some foods, it must be synthetically formulated for use as a food additive -- as is the case with the Products -- through commercial fermentation of carbohydrates or by using acetaldehyde and hydrogen cyanide to form lactronitrile, which is then chemically degraded via hydrolysis for form lactic acid. *See* 21 C.F.R. § 184.1061(a).

y.    **Glycerin** is a factory-produced texturizer that is created by complex processing. It is recognized by federal regulations as synthetic. *See* 7 C.F.R. § 205.605(b). It is commonly used as a filler and thickening agent. It requires multiple processing steps in an industrial environment to create Glycerin. Therefore, it cannot be described as "natural." A technical evaluation report compiled by the USDA AMS Agricultural Analytics Division for the USDA National Organic Program explains that Glycerin is "produced by a hydrolysis of fats and oils" and is listed in the USDA Organic Program's National List as a "synthetic nonagricultural (nonorganic) substance." The same report lists several methods of producing Glycerin, each of which involve numerous steps that include the use of high temperatures and pressure and purification to get an end product.

| Processes for producing glycerin by hydrolysis of fats and oils[13] | |
|---|---|
| Lemmens Fryer's Process | Oil or fat is subjected in an autoclave to the conjoint action of heat and pressure (about 100 PSI) in the presence of an emulsifying and accelerating agent, e.g. zinc oxide or hydroxide (sodium hydroxide can be substituted) for about eight hours.  The strong solution of glycerin formed is withdrawn and replaced by a quantity of hot, clean and preferably distilled water equal to about one third to one fourth of the weight of the original charge of oil or fat and treatment continued for an additional four hours.  The dilute glycerin obtained from the latter part of the process is drawn off and used for the initial treatment of the further charge of oil or fat. |
| Budde and Robertson's Process | The oils or fats are heated and mechanically agitated with water and sulphuric acid gas, under pressure in a closed vessel or autoclave. The advantage claimed for the process are that the contents of the vessel are free from foreign matter introduced by reagents and need no purification; that the liberated glycerin is in the form of a pure and concentrated solution; that no permanent emulsion is formed and that the fatty acids are not discolored. |
| Ittner's Process | Coconut oil is kept in an autoclave in the presence of water at 70 atmospheres pressure and 225-245oC temperature and split into fatty acids and glycerin, both being soluble under these conditions in water.  The glycerin solution separates in the bottom of the autoclave.  The aqueous solution contains at the end of the splitting process more than 30 percent glycerin. |
| Continuous High Pressure Hydrolysis | In this process a constant flow of fat is maintained flowing upward through an |

---

[13]

https://www.ams.usda.gov/sites/default/files/media/Glycerin%20Petition%20to%20remove%20TR%202013.pdf

|  | autoclave column tower against a downward counterflow of water at a pressure of 600 PSI maintained at temperature of 480-495oF. Under these conditions, the fat is almost completely miscible in water and the hydrolysis take place in a very short time. The liberated fatty acids, washed free of glycerin by the downward percolating water, leave the top of the column and pass through a flash tank while the liberated glycerin dissolves in the downward flow of water and is discharged from the bottom of the tower into the sweet-water storage tank. |
| --- | --- |

8.      Whether Defendant's labeling of the Products as natural is deceptive is judged by whether it would deceive or mislead a reasonable person.  To assist in ascertaining what a reasonable consumer believes the term natural means, one can look to the regulatory agencies for their guidance.

9.      In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural).  In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter.  *See* Exhibit A.

10.     Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plants, animals, or mineral sources."  7 U.S.C. § 6502(21).

11.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale.  Ordinary consumers would not know the true nature of the ingredients merely by reading the ingredients label.

12.     Discovering that the ingredients are not natural and are actually synthetic requires a scientific investigation and knowledge of chemistry beyond that of the average consumer.  That is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are synthetic.

13.     Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent claims, representations, and warranties that the Products are "Natural."

14.     Defendant did not disclose that the above listed ingredients are synthetic ingredients.  A reasonable consumer understands Defendant's "Natural" claims to mean that the Products are "Natural" and do not contain synthetic ingredients.

15.     Defendant has thus violated, *inter alia*,  NY General Business Law § 392-b by: (a) putting upon an article of merchandise, bottle, wrapper, package, label or other thing, containing or covering such an article, or with which such an article is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and (b) selling or offering for sale an article, which to its knowledge is falsely described or indicated upon

any such package, or vessel containing the same, or label thereupon, in any of the particulars specified.

16.     Consumers rely on label representations and information in making purchasing decisions.

17.     The marketing of the Products as "Natural" in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that "Natural" claims are material to consumers.

18.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

19.     Plaintiff and the Class members reasonably relied to their detriment on Defendant's misleading representations and omissions.

20.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class members.

21.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled as being "Natural" over comparable products not so labeled.

22.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the Class members in that they:

    a.     Paid a sum of money for Products that were not what Defendant represented;

b.  Paid a premium price for Products that were not what Defendant represented;

c.  Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

d.  Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

23.  Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class members would not have been willing to pay the same amount for the Products they purchased.

24.  Plaintiff and the Class members paid for Products that are "Natural" but received Products that are not "Natural." The Products Plaintiff and the Class members received were worth less than the Products for which they paid.

25.  Plaintiff and the Class members all paid money for the Products. However, Plaintiff and the Class members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## JURISDICTION AND VENUE

26.  The Court has jurisdiction over Plaintiff's claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

27.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in, and it conducts substantial business in, this District.

28.     Venue is proper because Plaintiff and many Class Members reside in the Eastern District of New York, and throughout the State of New York.  A substantial part of the events or omissions giving rise to the classes' claims occurred in this District.

**PARTIES**

**Plaintiff**

29.     Plaintiff is an individual consumer who, at all times material hereto, was a citizen of Woodbury, New York.  Plaintiff purchased the Blum Naturals Hand Cream with Jojoba Oil from Amazon.com during the Class Period.  The packaging of the Products Plaintiff purchased contained the representation that they were "Natural."  Plaintiff believes that products that are labeled as "Natural" do not contain synthetic ingredients.  Plaintiff believes a synthetic ingredient is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources.  If the Products actually are "Natural," as represented on the Products' label, Plaintiff would purchase the Products in the immediate future.

30.     Had Defendant not made the false, misleading, and deceptive representation that the Products were "Natural," Plaintiff would not have been willing to pay the same amount for the Products, and, consequently, would not have been willing to purchase the Products.  Plaintiff purchased, purchased more of, and/or paid more for, the Products than he would have had he known the truth about the Products.  The Products Plaintiff received were worth less than the Products for which he paid.  Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

**Defendant**

31.     Defendant, Jean Pierre, Inc. is a corporation with its principal place of business in this district at 320 5th Ave, New York, NY 10001.  Defendant manufactures, markets, advertises and distributes the Products throughout the United States.  Defendant created and/or authorized the false, misleading and deceptive advertisements, packaging and labeling for the Products.

## CLASS ALLEGATIONS

32.     Plaintiff brings this matter on behalf of himself and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices.  Defendant's customers were uniformly impacted by and exposed to this misconduct.  Accordingly, this Complaint is perfectly situated for class-wide resolution, including injunctive relief.

33.     The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period (the "Class").

34.     Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the State of New York at any time during the Class Period (the "New York Subclass").

35.     The Class and New York Subclass shall be referred to collectively throughout the Complaint as the Class.

36.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy for the following reasons.

37.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

38.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.      Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.      Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

c.      Whether Defendant made false and/or misleading statements to the Class and the public concerning the contents of its Products;

d.      Whether Defendant's false and misleading statements concerning its Products were likely to deceive the public;

e.      Whether Plaintiff and the Class are entitled to injunctive relief; and

f.      Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

39.     <u>Typicality</u>: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

40.     <u>Adequacy</u>: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members he seeks to represent; his consumer fraud claims are common to all members of the Class and he has a strong interest in vindicating his rights; he has retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action.

41.     <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

42.     <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.      The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.      The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c.      When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class Members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.    It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Defendant's uniform false advertising to purchase its Products as "Natural."

43.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## INJUNCTIVE CLASS RELIEF

44.    Rules 23(b)(1) and (2) contemplate a class action for purposes of seeking class-wide injunctive relief.  Here, Defendant has engaged in conduct resulting in misleading consumers about ingredients in its Products.  Since Defendant's conduct has been uniformly directed at all consumers in the United States, and the conduct continues presently, injunctive relief on a class-wide basis is a viable and suitable solution to remedy Defendant's continuing misconduct.  Plaintiff

would purchase the Products again if the ingredients were changed so that they indeed were "Natural."

45.     The injunctive Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

a.      <u>Numerosity</u>: Individual joinder of the injunctive Class Members would be wholly impracticable.  Defendant's Products have been purchased by thousands of people throughout the United States;

b.      <u>Commonality</u>: Questions of law and fact are common to members of the Class. Defendant's misconduct was uniformly directed at all consumers.  Thus, all members of the Class have a common cause against Defendant to stop its misleading conduct through an injunction.  Since the issues presented by this injunctive Class deal exclusively with Defendant's misconduct, resolution of these questions would necessarily be common to the entire Class.  Moreover, there are common questions of law and fact inherent in the resolution of the proposed injunctive class, including, *inter alia*:

i.      Resolution of the issues presented in the 23(b)(3) class;

ii.     Whether members of the Class will continue to suffer harm by virtue of Defendant's deceptive product marketing and labeling; and

iii.    Whether, on equitable grounds, Defendant should be prevented from continuing to deceptively mislabel its Products as "Natural."

c.      <u>Typicality</u>: Plaintiff's claims are typical of the claims of the injunctive Class because his claims arise from the same course of conduct (i.e. Defendant's

deceptive and misleading marketing, labeling, and advertising practices). Plaintiff is a typical representative of the Class because, like all members of the injunctive Class, he purchased Defendant's Products which were sold unfairly and deceptively to consumers throughout the United States.

d.   Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the injunctive Class. His consumer protection claims are common to all members of the injunctive Class and he has a strong interest in vindicating his rights. In addition, Plaintiff and the Class are represented by counsel who is competent and experienced in both consumer protection and class action litigation.

46.   The injunctive Class is properly brought and should be maintained as a class action under Rule 23(b)(2) because Plaintiff seeks injunctive relief on behalf of the Class Members on grounds generally applicable to the entire injunctive Class. Certification under Rule 23(b)(2) is appropriate because Defendant has acted or refused to act in a manner that applies generally to the injunctive Class (i.e. Defendant has marketed its Products using the same misleading and deceptive labeling to all of the Class Members). Any final injunctive relief or declaratory relief would benefit the entire injunctive Class as Defendant would be prevented from continuing its misleading and deceptive marketing practices and would be required to honestly disclose to consumers the nature of the contents of its Products. Plaintiff would purchase the Products again if the ingredients were changed so that they indeed are "Natural."

**FIRST CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 349**
**(On Behalf of Plaintiff and New York Subclass Members)**

47.   Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

48.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

49.     The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

50.     There is no adequate remedy at law.

51.     Defendant misleadingly, inaccurately, and deceptively present its Products to consumers.

52.     Defendant's improper consumer-oriented conduct—including labeling and advertising the Products as being "Natural"—is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

53.     Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for products that were—contrary to Defendant's representations— not "Natural." Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

54.     Defendant's advertising and Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products and to pay a premium price for them.

55.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

56.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff and the New York Subclass Members)**

57.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

58.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

59.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . . .

60.     Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent that the Products are "Natural."

61.     Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging and advertising and paid a premium for the Products which were—contrary to Defendant's representations—not "Natural."   Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

62.     Defendant's advertising, packaging and products' labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

63.     Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

64.     Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

65.     Defendant made the material misrepresentations described in this Complaint in Defendant's advertising, and on the Products' packaging and labeling.

66.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.   Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

67.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(On Behalf of Plaintiff and All Class Members)**

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     Defendant provided the Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are "Natural."

70.     The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

71.     These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' transactions.

72.     Plaintiff and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

73.     Within a reasonable time after they knew or should have known of Defendant's breach, Plaintiff, on behalf of himself and Class Members, placed Defendant on notice of its breach, giving Defendant an opportunity to cure its breach, which it refused to do.

74.     Defendant breached the express warranty because the Products are not "Natural" because they contain synthetic ingredients.

75.     Defendant thereby breached the following state warranty laws:

a.      Code of Ala. § 7-2-313;

b.      Alaska Stat. § 45.02.313;

c.      A.R.S. § 47-2313;

d.      A.C.A. § 4-2-313;

e.      Cal. Comm. Code § 2313;

f.      Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.      Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.     Wis. Stat. § 402.313;

xx.     Wyo. Stat. § 34.1-2-313.

76.     As a direct and proximate result of Defendant's breach of express warranty, Plaintiff and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSON-MOSS**
**WARRANTY ACT, 15 U.S.C. § 2301 *et seq*.**
**(On Behalf of Plaintiff and All Class Members)**

77.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     Plaintiff brings this claim individually and on behalf of all members of the Class. Upon certification, the Class will consist of more than 100 named Plaintiffs.

79.     The Magnuson-Moss Warranty Act provides a federal remedy for consumers who have been damaged by the failure of a supplier or warrantor to comply with any obligation under a written warranty or warranty, or other various obligations established under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*.

80.     The Products are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

81.     Plaintiff and other members of the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

82.     Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4) & 2301(5).

83.     Defendant represented in writing that the Products are "Natural."

84.     These statements were made in connection with the sale of the Products and relate to the nature of the Products and affirm and promise that the Products are as represented and defect

free and, as such, are "written warranties" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)(A).

85.     As alleged herein, Defendant breached the written warranty by selling consumers Products that are not "Natural."

86.     The Products do not conform to the Defendant's written warranty and therefore violate the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*.  Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### COMMON LAW UNJUST ENRICHMENT
**(On Behalf of Plaintiff and All Class Members in the Alternative)**

87.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     Plaintiff, on behalf of himself and consumers nationwide, bring a common law claim for unjust enrichment.

89.     Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling their Products while misrepresenting and omitting material facts.

90.     Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling their Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members, and to Defendant's benefit and enrichment.  Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

91.     Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

92.     Under New York's common law principles of unjust enrichment, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class Members' overpayments.

93.     Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, pray for judgment as follows:

(a)     Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b)     Entering preliminary and permanent injunctive relief against Defendant, directing Defendant to correct their practices and to comply with consumer protection statutes nationwide, including New York consumer protection laws;

(c)     Awarding monetary damages, including treble damages;

(d)     Awarding punitive damages;

(e)     Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

(f)     Granting such other and further relief as the Court may deem just and proper.

Dated:  May 29, 2020

THE SULTZER LAW GROUP P.C.

/s/ Jason P. Sultzer

By: _____

Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Adam Gonnelli, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com

Melissa S. Weiner
mweiner@pswlaw.com
Joseph C. Bourne
jbourne@pswlaw.com
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

*Counsel for Plaintiff and the Class*

54